IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD H. BOYD, | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | Case No. 09-4921 |
| v. | : | |
| | : | |
| CAMBRIDGE SPEAKERS SERIES, INC., | : | |
| et. al., | : | |
| | : | |
| Defendants. | : | |

**OPINION AND ORDER**

Slomsky, J.                                                                                                      June 18, 2010

## I. INTRODUCTION

Before the Court is Defendant's Motion to Enforce the Settlement Agreement and to Dismiss the Complaint. (Doc. No. 5). On October 23, 2009, Donald H. Boyd ("Plaintiff") commenced this action against his former employer, Cambridge Speakers Series, Inc. ("CSS"), and its owner, William F. Conrow (collectively "Defendants"), alleging claims under the Federal False Claims Act, 31 U.S.C.§ 3730(h) and state law. In his Complaint, Plaintiff alleges claims for retaliation under the Federal False Claims Act stemming from events during and following his employment, for unpaid wages under the Pennsylvania Wage Payment and Collection Law, for breach of Plaintiff's employment contract, for fraud on the part of Defendants in the calculation of Plaintiff's wages, and for invasion of privacy. (Pl. Compl., Doc. No. 1, at 10-18 (hereinafter "Doc. No. 1")). Plaintiff also seeks a declaratory judgment regarding the terms of his employment agreement. (Id.)

Defendants filed an Answer on December 23, 2009 (hereinafter "Doc. No. 3"), in which they deny the bulk of Plaintiff's factual allegations and legal claims, and assert counterclaims by

-1-

CSS against Plaintiff. In its counterclaims, CSS alleges: a claim for conversion seeking the return of a payment Defendants allege was erroneously made to Plaintiff; a claim for violation of the Computer Fraud and Abuse Act for unauthorized access to a company laptop and for causing damage by deleting data; and a claim for breach of contract / promissory estoppel for breach of a draft settlement agreement to which Defendant alleges Plaintiff agreed. (Doc. No. 3, at 19-24).

On December 23, 2009, Defendants also filed a Motion to Enforce Settlement Agreement and to Dismiss the Complaint. (Doc. No. 5). On January 11, 2010, Defendants filed under seal their Memorandum of Law in Support of the Motion to Enforce the Settlement Agreement and Dismiss the Complaint (hereinafter "Doc. No. 13"). On January 13, 2010, Plaintiff filed a Response in Opposition to Defendants' Motion to Enforce the Settlement Agreement and to Dismiss the Complaint and Cross-Motion to Strike Improper Exhibit[1] with accompanying Memorandum of Law (hereinafter "Doc. No. 15") and an Answer to Defendants' Counterclaim (Doc. No. 16). On January 20, 2010, Defendants filed a Memorandum of Law in Further Support of their Motion (hereinafter "Doc. No. 17"). A hearing on the Motion was held on March 15, 2010.

In their Motion to Enforce the Settlement Agreement and Dismiss the Complaint, Defendants move to enforce an alleged pre-litigation settlement agreement with Plaintiff and to dismiss the Complaint pursuant to Fed. R. Civ. Proc. 12(c) and 41, and Local Rule 41.1. (Doc. No. 13 at 1). Defendants contend that because the essential terms of the settlement were accepted in early July, 2009, the Court may enforce the agreement and dismiss the complaint. (Id.) Plaintiff asserts that although the parties agreed to numerous terms, there never was mutual

---

[1] For the reasons stated on the record by the Court on March 15, 2010, Plaintiff's Cross-Motion to Strike will be denied.

assent to all material terms and therefore no enforceable agreement exists. (Doc. No. 15, at 17). For the following reasons, the Court will deny Defendants' Motion in its entirety.

## II. SUMMARY OF THE FACTS

Plaintiff began working for Defendants in 2004 as Vice President of Development and Operations. (Doc. No. 1, at 2). CSS is a for-profit corporation that promotes and manages lecture series on behalf of its clients, which are universities in Pennsylvania, Maryland and Missouri. (Id. at 1). CSS markets its lecture series by mailing approximately 1.65 million brochures a year. (Id. at 4). During the course of his employment, Plaintiff became aware that CSS used non-profit postal permits of its clients (non-profit universities) to mail the company's brochures, despite the fact that CSS is a for-profit corporation. (Id. at 4). The use of non-profit permits represented substantial savings to the company, as use of non-profit postal permits allowed CSS to mail its brochures at a rate of 8 cents per piece, rather than the for-profit rate of 16 cents per piece. (Id. at 4).

Concerned that the use of the non-profit permits by a for-profit company violated federal law, Plaintiff urged Defendants to cease using the non-profit postal permits, but he was not successful. (Id. at 4-5). In response to Plaintiff's insistence on pursuing the postal permit issue, Defendants began to inspect and intercept Plaintiff's electronic communications.[2] (Id. at 7-8).

---

[2] The parties do not indicate in their filings how Defendants began to intercept Plaintiff's electronic communications. Plaintiff merely alleges in his Complaint that "Defendants began unlawfully inspecting and intercepting plaintiff's private electronic communications." (Doc. No. 1, at 7). Defendants allege in their Motion that "[CSS] had become aware that [Plaintiff] was using his computer, his CSS email address, CSS's network and CSS's network domain name to engage in communications that were derogatory toward CSS. . . [etc.]," but do not indicate how they learned about this information. (Doc. No. 13, at 3).

Defendants also demanded Plaintiff turn over his laptop and external hard drive in conjunction with the "vague allegation" that he had engaged in improper conduct. (Id.)

On April 30, 2009, Plaintiff's counsel sent a letter to Defendants detailing Plaintiff's legal claims against Defendants. (Doc. No. 1, at 8). In response, Defendants "immediately and improperly terminated [Plaintiff's] employment," and stopped his compensation, an action that Plaintiff alleges violated his employment agreement (Id.; Doc. No. 13, at 4.)

Following Plaintiff's termination, the parties began negotiating a settlement agreement which included, inter alia, release of claims and payment to Plaintiff. (Doc. No. 1 at 10). On May 27, 2009, Plaintiff sent Defendants a letter which "sets forth a summary of the facts leading up to the current dispute, [Plaintiff's] legal claims, [Plaintiff's] estimate of damages should [he] be forced to litigate [the] matter, and [Plaintiff's] proposed settlement terms." (Doc. No. 15, Ex. 8). On June 17, 2009, Defendants responded, noting that the parties "remain some distance apart," and reciting a counter-statement of the facts, and including a "Settlement Counter-Proposal" which differed substantially from Plaintiff's opening offer.[3] (Doc. No. 15, Ex. 9).

---

[3] Plaintiff's settlement offer demanded two years of severance pay of at least $594,000 per year; 17 weeks of unused vacation time accumulated over the past five years, paid at the rate of $594,000 per year; two years of health insurance coverage; "mutual confidentiality and non-disparagement, and other standard and reasonable terms;" reduction of the non-competition clause in Plaintiff's employment contract from five years to two; no opposition to Plaintiff's filing for unemployment compensation; copies of prior paystubs; and reimbursement for a final expense report estimated at $1,500. (Doc. No. 15, Ex. 8). Defendants responded by changing the following terms: acceptance of Plaintiff's resignation rather than termination for cause; payment of one-year severance at a rate of $421,204 per year, less an "overpayment" of $172,927 from 2008; payment of two weeks vacation based upon the above annual compensation; and execution of a general release of all claims against CSS and Bill Conrow. (Doc. No. 15, Ex. 9).

On June 26, 2009, Plaintiff's counsel responded to Defendants' counteroffer by email, stating that Plaintiff would "accept Defendant's latest counterproposal with the following clarifications and terms." (Doc. No. 15, Ex. 10, at 1). Plaintiff then listed eight terms, some of which differed from those provided by Defendants, and others which coincided with Defendants' offer.[4] Plaintiff's eight terms also omitted terms which Plaintiff had originally demanded. (Id.) Plaintiff offered no explanation as to whether Plaintiff was no longer pursuing those terms or whether Plaintiff expected negotiations to continue on those terms.[5] (Id.)

On July 1, 2009, Defendant responded to Plaintiff's counteroffer. The email began, "[Defense counsel] got [Plaintiff counsel's] voice mail, and here is what [Defense counsel] can say." Defendants then addressed each of the eight terms in separate paragraphs, agreeing in substance[6] to all of the terms except for the term regarding Plaintiff's work computer. (Doc. No. 13, Ex. 11, at 2). Regarding the computer, Defendants' email stated, "CSS cannot accept the

---

[4] In particular, Plaintiff: demanded $425,000 paid in a lump sum (presumably in lieu of the 2 and 1 year severance demand and offer); reiterated his demand that CSS not oppose his application for unemployment compensation; reiterated his request for prior pay stubs; and added a demand that the Plaintiff's work laptop and hard drive be returned to Plaintiff after CSS downloaded and purged it of confidential information. (Doc. No. 15, Ex. 10). Plaintiff also repeated the terms regarding mutual confidentiality and non-disparagement, Plaintiff's non-compete covenant and Plaintiff's non-solicitation covenant – terms to which Defendants had agreed. (Doc. No. 15, Ex. 9 and 10).

[5] Plaintiff omitted reference to the health insurance coverage (which Defendants did not include in their counteroffer) and vacation time (which Defendants reduced in their counteroffer) listed in his original demand. (Doc. No. 15, Ex. 8 and 10). Plaintiff also omitted reference to his final expense report, a term to which Defendant had agreed. (Doc. No. 15, Ex. 9 and 10).

[6] Defendants included caveats on several of the terms. For example, with regard to the lump sum payment, Defendants stipulated that "the time of delivery of the payment will have to be triggered by execution of an effective agreement and release," rather than by July 26, 2009, as demanded by Plaintiff. (Doc. No. 15, Ex. 10 and 11).

resolution of the computer issue as stated – however, [Defense counsel] will continue to work with [Plaintiff's counsel] to get to a mutually acceptable solution." (Id.)  At the end of the email containing Defendants' response to Plaintiff's counteroffer, Defendants added, for the first time,[7] that:

> all of these terms and agreements are of course contingent upon our clients accepting and executing a Settlement Agreement and General Release covering all claims and defenses made in this dispute, as well as any and all other disputes, issues or causes of action that may exist between the parties, known or unknown.

(Id.)

The parties have not provided documentation of Plaintiff's immediate response to Defendants' July 1, 2009 counteroffer.  Plaintiff's first substantive response to the counteroffer included in the record was an email Plaintiff sent to Defendants on July 21, 2009 stating Plaintiff was contemplating filing suit and considered "the tentative settlement null and void due to [Defendants'] unreasonable and willful refusal to move forward on trying to settle this matter." (Doc. No. 15, Ex. 12).  Plaintiff's counsel further stated that "[i]f [defense counsel] have a proposed agreement, approved by [Defendants], send it.  Otherwise, [Plaintiff] will proceed with considering all options." (Id.)

On July 27, 2009, Defendants provided a draft agreement to Plaintiff. (Doc. No. 15, Ex. 13).  Plaintiff's counsel implicitly rejected Defendants' draft on August 3, 2009, stating, "[w]ith regard to this proposed agreement, is it [Defendants'] assertion that the parties' agreed to. . ."

---

[7] Defendants had included in their June 17, 2009 counteroffer the term that Plaintiff execute "a General Release of all claims against CSS and [Defendant] Conrow." (Doc. No. 15, Ex. 9).  Defendants' July 1, 2009 email contains the first reference to a mutual release. (Doc. No. 15, Ex. 11).

and then listing fourteen terms included in Defendants' draft which Plaintiff disputed. (Doc. No. 15, Ex. 14). On August 20, 2009, Plaintiff sent Defendants a letter which provided an "outline of the changes required in the proposed settlement agreement." (Doc. No. 15, Ex. 15, at 1).

On September 17, 2009 Defendants sent another draft settlement agreement which purported to "incorporat[e] the changes requested by [Plaintiff]." (Doc. No. 15, Ex. 18). On September 22, 2009, Plaintiff rejected Defendants' draft, asserting that it did not represent the agreed-upon terms. (Doc. No. 15, Ex. 19). Plaintiff's counsel stated: "[a]s discussed, [Plaintiff] require[s] the following changes to consummate this settlement agreement. If [Plaintiff] do[es] not receive acceptance of these few requirements, and/or a response, within 10 days, we will consider our proposals rejected, and conclude there has been no meeting of the minds." (Id.) On October 2, 2009, Defendants provided Plaintiff with a final draft agreement which changed the terms of prior drafts by removing the mutual release and reducing the settlement value.[8] (Doc. No. 15, Ex. 21). The record is unclear whether Plaintiff replied to this counteroffer.

Plaintiff maintains that although there was an agreement in general on some material terms, other essential terms remained unresolved. (Doc. No. 15, 2). In particular, Plaintiff

---

[8] Defense counsel explained in his cover letter:

> Please note that because of the [accidental July salary] overpayment that came to light last week and [Plaintiff's] failure to call the overpayment to the attention of CSS during our discussions over the past two months, CSS is no longer interested in making the release mutual. In addition, please note that I have reduced the amount of the total settlement value by an amount equal to the July overpayment. CSS is not interested in negotiating or discussing this matter further, therefore, this draft is final and [Plaintiff] can either accept it or reject it, but CSS is not going to substantively change any terms.

(Doc. No. 15, Ex. 21, at 1).

asserts that no agreement was reached on: (1) the essential term of mutual release of all claims by all parties; (2) the date of payment to Plaintiff; and (3) a liquidated damages clause that Defendants proposed late in negotiations. (Id.) The parties were seemingly making some progress in negotiations through September 2009, although Plaintiff began objecting to delays on the part of Defendants by the end of July 2009. On or about September 24, 2009, however, Defendants discovered a payroll mistake that resulted in an erroneous payment made to Plaintiff in July 2009.[9] (Doc. No. 15, Ex. 20). Thereafter, Defendants were no longer willing to agree to a mutual release (Doc. No. 15, Ex. 21), and negotiations apparently ended.

Defendants circulated the last of the proposed settlement terms on October 2, 2009. (Doc. No. 15 at 14; Doc. No. 13 at 8). Defendants maintain that this version best represents the parties' agreement as to all material terms negotiated by the parties. (Doc. No. 13 at 8). Plaintiff, on the contrary, asserts that this version does not reflect agreed-upon terms. Plaintiff maintains that Defendants' final version rejected agreed-upon terms and included new terms and unilateral changes. (Doc. No. 15 at 14.) Furthermore, in a letter accompanying this draft, Defendants indicated that the draft was final, and Plaintiff could "either accept it as is, or reject

---

[9] On July 24, 2009, Defendants' payroll service, ADP, accidentally paid Plaintiff, by direct deposit, a gross pay of $35,387 (net pay $24,502.53). A letter from ADP to CSS confirms that the payment was an error on the part of the payroll service. (Doc. No. 13, Ex. 8). Plaintiff did not initially comment on the payment to Defendant, and did not explicitly state in the subsequent negotiations that the final settlement payment would be reduced by the amount of the payment. Plaintiff maintains that he thought the payment was "earnest money paid to [Plaintiff] as a demonstration of good faith" on the part of Defendants, and that he "never intended to accept or retain anything above the $425,000 settlement figure." (Doc. No. 13, Ex. 9, 10). Defendants characterized Plaintiff's explanation as "disingenuous at best," and accused Plaintiff of attempting to "fraudulently induce CSS to agree to terms that [Plaintiff] clearly intended to prevent CSS from ever recovering this mistaken overpayment." (Id.).

it, but [Defendants] [are] not going to substantively change any terms." (Doc. No. 15, Ex. 21). Plaintiff did not respond, and on October 23, 2009 filed the instant lawsuit.

**III.  MOTION FOR JUDGMENT ON THE PLEADINGS STANDARD**

Defendants filed their Motion to Enforce and Dismiss under Fed. R. Civ. P. 12(c).[10] A motion for judgment on the pleadings under Rule 12(c) may be brought "after the pleadings are closed but within such time as not to delay the trial," National Recovery Agency Inc. v. AIG Technical Services, Inc., 2005 WL 2100702, *3 (M.D. Pa. 2005), and is analyzed under the same standard as a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6), Allison v. GEO Group, Inc., 611 F. Supp. 2d 433, 440 (E.D. Pa. 2009) (internal citation and quotation marks omitted).

A party moving for judgment on the pleading must show that "no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." Rosenau v.

---

[10] Defendants note that their Motion to Dismiss is also being brought pursuant to "Fed. R. Civ. P. 41 and Local Rule of Civil Procedure 41.1(b)." Local Rule 41.1(b) applies when counsel notify the "Clerk or judge to whom the action is assigned that the issues between the parties have been settled." "Where there has been no settlement, dismissal under this rule is not appropriate." Local Rule 41.1(b), Comment 2, p.177 (citing Palmer v. Security Nat'l Bank, 2001 U.S. Dist. LEXIS 11473 (E.D. Pa. 2001)). Because the issue of whether the parties entered into an enforceable settlement agreement will be the focus of the Court's analysis under the Rule 12(c) motion, the Court's discussion and findings regarding Defendants' 12(c) motion will apply equally to their 41.1(b) motion.

Fed. R. Civ. P. 41 provides for voluntary and involuntary dismissals. Because voluntary dismissal under Rule 41 must be brought by Plaintiff, only Rule 41(b), regarding involuntary dismissal, can apply here. Rule 41(b) provides that "[i]f the plaintiff fails to prosecute or comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Dismissal under Rule 41(b) "'is a drastic action and should be reserved for those cases where there is a clear record of delay or contumacious conduct by the plaintiff.'" N'Jai v. Floyd, 296 Fed. Appx. 266, 267 (3d Cir. 2008) (citing Donnelly v. Johns-Manville Sales Corp., 677 F.2d 339, 342 (3d Cir. 1982)). Defendants, however, have failed to show how Rule 41 applies to the instant case, and the Court is unable to identify a basis for its application. Accordingly, Defendant's Motion to Dismiss pursuant to Fed. R. Civ. Proc. 41 will be denied.

Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Jablonski v. Pan Am World Airways, Inc., 863 F.2d 289, 290-91 (3d Cir. 1998)). A motion for judgment on the pleadings will only be granted where "the plaintiffs would not be entitled to relief under any set of facts that could be proved." Allison, 611 F. Supp. 2d at 440 (quoting Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 20 (3d Cir. 2001). The facts presented in the pleadings and the inferences to be drawn from them are to be viewed in the light most favorable to the nonmoving party. Id.

## IV. DISCUSSION

As a general rule, courts "encourage attempts to settle disagreements outside the litigative context," and a district court may accordingly enforce a settlement agreement. Wilcher v. City of Wilmington, 139 F.3d 366, 372 (3d. Cir. 1998). When parties agree to resolve pending litigation through a settlement agreement and a dispute arises regarding the enforcement of that agreement, a district court may "enter injunctive relief on a party's behalf to enforce a settlement agreement when it determines that one of the parties has failed to perform its obligations." Saudi Basic Industries Corp. v. Exxon Corp., 364 F.3d 106, 112 (3d. Cir. 2004) (quoting Wilcher, 139 F.3d at 372).

A settlement agreement may, however, be developed between parties before suit is filed and serve as either a basis for, or defense to, later litigation. When a disputed settlement agreement precedes litigation, and a plaintiff brings suit seeking to enforce the "agreement" or a defendant asserts the "agreement" as a defense, the court treats the enforcement claim as a claim to enforce a contract. E.g., American Eagle Outfitters v. Lyle & Scott Limited, 584 F.3d 575, 581 (3d Cir. 2009) (hereinafter "American Eagle"); Quandry Solutions, Inc. v. Verifone, Inc., 2009 WL997041 (E.D.Pa. Apr. 13, 2009). Here, the disputed settlement agreement preceded Plaintiff's suit, and is being asserted by the Defendants as a defense to Plaintiff's claims.

A settlement agreement is a contract.  Wilcher, 139 F.3d at 372.  When a court seeks to interpret an agreement's formation or terms, it applies local law.  Id.  Under Pennsylvania law, "where the facts are in dispute, the question of whether a contract was formed is for the jury to decide . . . However, the question of whether an undisputed set of facts establishes a contract is a matter of law. "  Quandry Solutions, 2009 WL 997041, at *5 (internal quotation marks and citation omitted).  Therefore, in order to prevail on their motion for judgment on the pleadings, Defendants must show that there are no disputed material facts regarding whether a contract was formed, and that there are no disputed material facts regarding the terms of the contract (i.e., that the terms of the contract are not ambiguous).  See American Eagle, 584 F.3d at 581 ("In granting summary judgment for American Eagle, the Magistrate Judge found that the parties had created an enforceable contract, and further, that the terms of the contract were not ambiguous.")  In determining whether Defendants have met this burden, the Court must view the facts in the light most favorable to Plaintiff as the non-moving party, as required by the Rule 12(c) standard discussed supra.

### A. **Enforceable Contract**

To determine whether the parties have formed an enforceable contract, the court must consider: "'whether both parties have manifested an intention to be bound by its terms and

whether the terms are sufficiently definite to be specifically enforced.'"[11] American Eagle, 584 F.3d at 581 (quoting Channel Home Cters. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986).

### 1. Intent to be Bound

In assessing whether "both parties manifested an intention to be bound" by a contract, "the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." American Eagle, 584 F.3d at 582 (citing Ingrassia Constr. Co., Inc. v. Walsh, 486 A.2d 478, 483 (Pa. Super. 1984)). A "true and actual meeting of the minds" is therefore not necessary for the formation of a contract. Id. Indeed, "in some circumstances. . . a manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." Quandry Solutions, 2009 WL 997041, at *8 (citing Restatement (Second) of Contracts § 22(2) (1981)).

Furthermore, "parties may bind themselves contractually although they intend, at some later date, to draft a more formal document." American Eagle, 584 F.3d at 582 (internal citations and quotation marks omitted). As the Pennsylvania Supreme Court explained:

> Where the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but

---

[11] The second element of this test – whether the terms are sufficiently definite to be specifically enforced – is distinct from the question of whether the terms of the agreement are sufficiently unambiguous to permit judicial interpretation of the contract. The "sufficiently definite" element focuses on whether the parties agreed on the "material and necessary details of the bargain." American Eagle, 584 F.3d at 585. The ambiguity inquiry focuses on whether the terms of a contract are sufficiently clear and unambiguous to permit judicial interpretation of the contract as a matter of law. Id. at 587. Thus, a court may find that the parties intended to be bound and that the terms of the agreement are sufficiently definite so that an enforceable contract was formed as a matter of law, but that "the language chosen by the parties is ambiguous," necessitating interpretation of the contract terms by a jury. Id.

> have not yet done so does not prevent enforcement of such
> agreement . . . Even the inability of the parties to an oral
> agreement to reduce such agreement to writing after several
> attempts does not necessarily preclude a finding that the oral
> agreement was enforceable.

Mazzella v. Koken, 739 A.2d 531, 536 (Pa. 1999).  However,

> where it is in contemplation of the parties that a more formal
> contract shall be executed, it is an essential element of the informal
> contract that the minds of the parties should meet upon all the
> terms, as well as the subject matter of the contract; and, if anything
> is left open for future consideration, the informal agreement cannot
> form the basis of a binding contract.

Quandry Solutions, 2009 WL 997041, at *12.

Moreover, Pennsylvania law has long recognized that "documents, having the surface appearance of contracts may be in fact evidence of mere negotiating by parties with a view toward executing a binding contract in the future." American Eagle, 584 F.3d at 582.  Indeed, "it is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract."  Id. (citing Channel Home Ctrs., 795 F.2d at 298).  If there is conflicting evidence regarding whether the parties intended a particular writing to constitute a complete expression of their agreement, the intent of the parties is a question to be resolved by a finder of fact.  Mazzella, 739 A.2d at 536.

Here, the court conducted an extensive review of the communications exchanged between the parties and submitted as exhibits to the parties' memoranda on the instant motion. These communications, when viewed in the light most favorable to Plaintiff as the non-moving party, reveal that the parties consistently behaved as if they were engaged in negotiations, and not as if an agreement had been finalized.

Plaintiff initiated settlement discussions on May 27, 2009, with a letter that contained a "Settlement Proposal." (Doc. No. 15, Ex. 8). On June 17, 2009, Defendant responded with a counteroffer, which was titled "Settlement Counter-Proposal" and offered substantially different terms from Plaintiff's offer. (Id., Ex. 9, at 9-10). On June 26, 2009, Plaintiff responded to Defendants' "Counter-Proposal" in an email, stating that Plaintiff would "accept Defendant's latest counterproposal with the following clarifications and terms," which included a substantial difference in payment terms and additional terms regarding Plaintiff's work laptop. (Id., Ex. 10, at 1). Plaintiff characterized the terms in this email as his "best and final, non-negotiable response." (Id.)

Plaintiff's June 26 response does not constitute an acceptance, but rather is a counteroffer: "A reply to an offer which purports to accept it, but changes the conditions of the offer, is not an acceptance but is a counteroffer, having the effect of terminating the original offer." GMH Associates, Inc. v. Prudential Realty Group, 752 A.2d 889, 899 (Pa. Super. 2000) (internal citation and quotation marks omitted).

Likewise, Defendants' response to this counteroffer – Defense counsel's July 1, 2009, email – is also a counteroffer. Defendants rejected Plaintiff's "resolution of the computer issues as stated" and indicated further negotiations on that point would be necessary. (Doc. No. 15, Ex. 11). Defendants also inserted caveats regarding the time of delivery of payment (by adding a contingency that "payment will have to be triggered by execution of an effective agreement and release") and regarding the parameters of Defendants' position on Plaintiff's unemployment compensation benefit application ("however if called upon to testify, CSS representatives will tell the truth as they believe it to be"). (Id.) Lastly, Defendants added a condition that both parties would need to execute general releases. (Id.)

As noted by the court in Quandry Solutions, where the parties intend to later execute a more formal contract, the minds of the parties must meet upon *all* of the terms of the informal contract in order for the preliminary, informal contract to be enforceable. 2009 WL 997041, at *12. "*If anything is left open for future consideration, the informal [agreement] cannot form the basis of a binding contract.*" Id. (emphasis in original) (internal citation and quotation marks omitted). Since Plaintiff's offer here consisted of only eight terms, all of them may be considered "material." Because Defendants rejected one of those terms, suggested the parties continue negotiations on this term, and made adjustments to other terms, all of the terms of the informal contract were not agreed upon, and so the informal agreement cannot form the basis of a binding contract. Id.

Furthermore, the parties' communications following Defendants' July 1 counteroffer fall into a clear pattern of offer and rejection/counteroffer, throughout which it is clear that there was no meeting of the minds between the parties. When the June and July emails are viewed in the context of these later negotiations, it becomes clear that the communications between counsel constituted "mere negotiating by parties with a view toward executing a binding contract in the future." American Eagle, 584 F.3d at 582. Although Defendants had agreed to *some* of the terms in Plaintiff's "best and final, non-negotiable response," (Doc. No. 15, Ex. 10) and although Plaintiff stated the parties reached a "tentative agreement" as of July, (Id., Ex. 15, at 5), it is clear that there was no meeting of the minds on all of the terms of the informal agreement. Moreover, as negotiations progressed from this incomplete informal agreement, it is clear there were significant disputes between the parties over the terms of the final agreement.[12]

---

[12] In response to the first draft agreement provided by Defendants on July 27, 2009 (Doc. No. 15, Ex. 13), Plaintiff sent an email listing fourteen points in the draft disputed by Plaintiff

-15-

Defendants assert that the parties reached a meeting of the minds in June or July of 2009, and that the subsequent negotiations simply revealed "gaps" in the agreement. Defendants point to case law providing that after a meeting of the minds has occurred as to essential terms of a settlement agreement, "gaps in the agreement will not vitiate it." Forte Sports, Inc. Toy Airplane Gliders of America, Inc., 371 F. Supp. 2d 648, 650 (E.D. Pa. 2004). Defendants also point to Mazzella v. Koken, 739 A.2d 531, where the court reasoned that "even the inability of the parties to an oral agreement to reduce such agreement to writing after several attempts does not necessarily preclude a finding that the oral agreement was enforceable." Id. at 536.

However, no meeting of the minds ever occurred between the parties, as each offer made by a party was met with amendments by the other party - an act which constitutes a counteroffer. Mazzella, 739 A.2d at 538. Furthermore, Defendants' assertion that their final settlement offer of October 2 "best evidences the parties' pre-litigation agreement" is belied by the cover letter attached to Defendants' draft, which clearly indicates Defendants' final draft included unilateral changes to the terms of the settlement which were to be accepted or rejected by Plaintiff. See supra note 8. As the Court in Mazzella explained: "We are mindful that it is understandable [that] when, after a prolonged period of negotiations, parties appear to reach agreement on the essential terms of an important transaction, one of them might believe that a contract has been

---

(Id., Ex. 14), and followed up with a letter detailing changes to the draft "agreement" required by Plaintiff, including changes to the date of payment and to the start date of the non-compete and non-solicitation agreements, and insistence on a mutual release of claims (Id., Ex. 15). In response to the second draft agreement submitted by Defendants on September 17, 2009, (Id., Ex. 18), Plaintiff sent an email reiterating that changes be made to the start dates of the non-compete and non-solicitation agreements, noting that Defendants unilaterally added language to one term, and insisting that the release of claims be mutual (Id., Ex. 19). After Defendants provided a third draft agreement on October 2, 2009 (Id., Ex. 21), Plaintiffs filed the instant action.

made. However, before preliminary negotiations ripen into contractual obligations, there must be manifested mutual assent to the terms of a bargain." 739 A.2d at 536. Here, when the facts are viewed in the light most favorable to Plaintiff, no "manifest mutual assent" is apparent, and accordingly the Court cannot say that an enforceable contract was formed as a matter of law.

## V.     CONCLUSION

Viewing the facts in the light most favorable to Plaintiff, Defendant has failed to show the formation of an enforceable contract during the parties' pre-litigation settlement negotiations. Any dispute as to the parties' intent that a particular writing constitutes a complete expression of their agreement is a question of fact which cannot be resolved at this stage in the litigation. Accordingly, Defendants' Motion to Dismiss pursuant to Rule 12(c) will be denied. Because Defendant has not established the formation of an enforceable settlement agreement, Defendant's Motion to Dismiss pursuant to Local Rule of Civil Procedure 41.1(b) will also be denied. Lastly, as discussed supra note 10, Defendant's Motion to Dismiss pursuant to Fed. R. Civ. Proc. 41 will be denied. Therefore, Defendant's Motion to Enforce the Settlement Agreement and to Dismiss the Complaint will be denied in its entirety. As discussed supra note 1, Plaintiff's Cross-Motion to Strike will also be denied. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD H. BOYD, | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | Case No. 09-4921 |
| v. | : | |
| | : | |
| CAMBRIDGE SPEAKERS SERIES, INC., et. al., | : | |
| | : | |
| | : | |
| Defendants. | : | |

**<u>ORDER</u>**

AND NOW, this 18th day of June, 2010, upon consideration of Defendant's Motion to Enforce the Settlement Agreement and to Dismiss the Complaint (Doc. No. 5), Defendant's Memorandum of Law in Support of Motion (Doc. No. 13), Plaintiff's Response to Defendant's Motion (Doc. No. 15), Defendant's Memorandum of Law in Further Support of its Motion (Doc. No. 17), and after a hearing on the Motion on March 16, 2010, it is hereby ORDERED that Defendant's Motion to Enforce the Settlement Agreement and to Dismiss the Complaint (Doc. No. 5) is DENIED in its entirety. It is further ORDERED that Plaintiff's Cross-Motion to Strike Improper Exhibit (Doc. No. 15) is DENIED.

BY THE COURT:

　/s/ Joel H. Slomsky, J.　
JOEL H. SLOMSKY, J.